02-11-489-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00489-CV

 


 
 
 In the Interest of S.I.H., A Child
 
 
  
 
 
  
 
 


 

----------

 

FROM County
Court at Law No. 1 OF Parker COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          In
seven issues, appellant T.G. appeals the trial court’s order terminating her
parental rights to her son, S.I.H. (Steven).[2]  She asserts that the
trial court erred by admitting two exhibits and that the evidence is factually
insufficient to support the trial court’s termination decision.  We affirm.

Background Facts

          During
appellant’s childhood in Nebraska, authorities removed her from her mother’s
care and placed her in foster care.  She dropped out of high school when she
was a sophomore.  Since then, including Steven, appellant has birthed eleven
children.  At the time of Steven’s termination trial in November 2011, when
appellant was thirty-nine years old, none of the children were in her
possession. Before the trial court terminated appellant’s parental rights to Steven,
other courts had terminated her rights to nine of her other children.[3]

          Appellant
gave birth to Steven in February 2008; according to appellant, Steven had no
special medical conditions at that time.[4]  Sometime between
Steven’s birth and June 2010, Child Protective Services (CPS) personnel
attempted to investigate matters related to Steven’s care, but they were unable
to do so because they could not locate appellant.  Appellant began living with
Jacqueline Ward in 2009.  In 2010, when Steven was two years old, appellant
left him with Ward.  According to Nikki Lepori, a CPS investigator, appellant
did so to go “off with a boyfriend somewhere”; according to appellant, she did
so to seek a house and a job.  Appellant says that Ward volunteered to keep
Steven and that appellant left contact information that Ward could use in the
event of an emergency.

          Because
of a concern that Steven had been abandoned, CPS removed him from Ward’s care,
and on June 1, 2010, the Department of Family and Protective Services (the
Department) filed a petition that sought termination of appellant’s parental
rights to Steven if reunification could not be achieved.[5] 
Ward told CPS that she was unable to care for Steven because she had psychotic
issues; she explained that she had post traumatic stress disorder, a
substantial history of drug abuse, and “many suicide attempts.”  The Department
attached an affidavit to its petition that detailed appellant’s CPS history. 
The trial court appointed the Department as Steven’s temporary sole managing
conservator and set an adversary hearing concerning Steven’s removal.[6]

          When
CPS removed Steven from Ward’s home, he had a normal weight, but he was
“significantly delayed.”  His head was flat on one side and looked “grossly
misshapen” to Lepori.  Lepori arranged for Steven to be diagnosed at a
children’s hospital.  While they were there, Lepori and another investigator
were able to play with Steven; they sang to him while he learned the song,
danced, and smiled, which indicated to Lepori that he could learn but had been
severely neglected.  Lepori testified that a doctor diagnosed Steven to be suffering
from severe neglect.

          At
the time of Steven’s removal, a night intake worker attempted to locate appellant
but was unable to do so.  Although CPS later found appellant and served her
with notice of Steven’s removal, she did not appear at the adversary hearing or
some out-of-court meetings concerning Steven. Lepori eventually spoke with
appellant, and appellant could not name all of the children she had birthed.  Appellant
told Lepori that she could not visit Steven because she was busy.  CPS
eventually placed Steven with C.D., Steven’s paternal aunt (Aunt).

          Following
the adversary hearing in June 2010, the trial court granted appellant
visitation of one hour per week with Steven.  The court also ordered appellant,
under section 263.106 of the family code,[7] to comply with each
requirement of the Department’s service plan.  The Department’s July 2010
service plan required appellant to maintain monthly contact with the
department; complete a psychological evaluation, a drug and alcohol assessment,
and parenting classes; participate in individual counseling; and maintain
suitable housing.

          According
to Matthew Reed, the CPS caseworker assigned to Steven’s case at the time of
the trial, appellant called him on a quarterly basis, and during those
conversations, she did not ask how Steven was doing.[8] 
Appellant did not maintain contact with Steven (she did not visit him after
January 2011, although she asked to do so in the fall of 2011).  Appellant
completed a psychological evaluation and parenting classes, but she did not
complete counseling because she failed to regularly attend.  She also failed to
take the drug and alcohol assessment or to maintain stable housing.  The psychological
evaluation revealed that appellant has an IQ of approximately seventy-five and
suffers from depression.  Appellant said that CPS personnel lied to her by
telling her that they would get her into drug and alcohol treatment, although
she denied needing the treatment.  She testified that although she tried to get
to counseling on time, she could not do so because she did not have money for
public transportation, and walking to counseling could not “cut it when you’re
way on the other side of town.”[9]  Although appellant
sought counseling at another location, it was too expensive, so she quit going.

          At
times, appellant was homeless, and at other times, she stayed with friends.  She
would not give Reed the addresses of places she was living.  Appellant did not
have a driver’s license, and she told Reed that she walked “pretty much
everywhere she [went].”

          Reed
watched appellant’s visit with Steven in January 2011, and Reed noticed that
appellant had “very little contact” with Steven.  She sat on the couch while
Steven played on the floor, and she talked to him sparsely.  These actions were
similar to how appellant had acted in previous visits with him.  Reed never
heard Steven refer to appellant as his mother, and he never saw any attachment
between Steven and appellant although Steven had formed attachments with other
people, including Reed.  According to Reed, appellant missed her weekly visits
with Steven after January 2011 because she “was busy, she had a job interview,
or she didn’t have transportation.”  He said that he attempted to persuade
appellant to use public transportation and that she had enough advanced notice
of the visits that she could have walked to them.

          The
trial of the Department’s termination petition occurred in November 2011.  At
the end of the trial, the trial court found that appellant had knowingly placed
or knowingly allowed Steven to remain in conditions that endangered his
physical or emotional well-being, engaged in conduct or knowingly placed Steven
with persons who engaged in conduct that endangered his physical or emotional
well-being, constructively abandoned him, and failed to comply with the
provisions of a court order that specifically established the actions necessary
for Steven to be returned to her.  The trial court also found that termination
of appellant’s rights was in Steven’s best interest, and it therefore
terminated her rights.  Appellant brought this appeal.

Factual
Sufficiency

          In
her third through seventh issues, appellant argues that the evidence is factually
insufficient to support the termination of her parental rights to Steven.  A parent’s
rights to “the companionship, care, custody, and management” of his or her
children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).

          In a
termination case, the State seeks not just to limit parental rights but to
erase them permanently—to divest the parent and child of all legal rights,
privileges, duties, and powers normally existing between them, except for the
child’s right to inherit.  Tex. Fam. Code Ann. § 161.206(b) (West 2008); Holick
v. Smith, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize
termination proceedings in favor of the parent.  Holick, 685 S.W.2d at
20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no
pet.).

          In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2011); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Termination decisions
must be supported by clear and convincing evidence.  Tex. Fam. Code Ann.
§ 161.001.  Evidence is clear and convincing if it “will produce in the
mind of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established.”  Id. § 101.007 (West 2008). 
Due process demands this heightened standard because termination results in
permanent, irrevocable changes for the parent and child.  In re J.F.C.,
96 S.W.3d 256, 263 (Tex. 2002).

          In
reviewing the evidence for factual sufficiency, we must give “due consideration
to evidence that the factfinder could reasonably have found to be clear and
convincing.”  Id. at 266.  We do not supplant the judgment with
our own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that the parent committed an act listed in section 161.001(1)
and that the termination of the parent-child relationship is in the best
interest of the child.  Tex. Fam. Code Ann. § 161.001; C.H., 89
S.W.3d at 28.  If, in light of the entire record, the disputed evidence that a
reasonable factfinder could not have credited in favor of the finding is so
significant that a factfinder could not reasonably have formed a firm belief or
conviction in the truth of its finding, then the evidence is factually
insufficient.  H.R.M., 209 S.W.3d at 108.

Termination
under section 161.001(1)(E)

          Among
three other conduct-based grounds, the trial court terminated appellant’s
parental rights on the basis that she engaged in conduct or knowingly placed
Steven with persons who engaged in conduct that endangered his physical or
emotional well-being.  See Tex. Fam. Code Ann. § 161.001(1)(E).  Appellant
challenges this basis for termination in her fourth issue.

          As
we have recently explained,

          Endangerment
means to expose to loss or injury, to jeopardize.  Under section 161.001(1)(E),
the relevant inquiry is whether evidence exists that the endangerment of the
child’s physical well-being was the direct result of [the parent’s] conduct,
including acts, omissions, or failures to act.  Additionally, termination under
subsection (E) must be based on more than a single act or omission; the statute
requires a voluntary, deliberate, and conscious course of conduct by the
parent.  It is not necessary, however, that the parent’s conduct be directed at
the child or that the child actually suffer injury.  The specific danger to the
child’s well-being may be inferred from parental misconduct standing alone.  Moreover,
a parent’s mental state may be considered in determining whether a child is
endangered if that mental state allows the parent to engage in conduct that
jeopardizes the physical or emotional well-being of the child.  To determine
whether termination is necessary, courts may look to parental conduct occurring
both before and after the child’s birth. 

In
re M.E.-M.N., 342 S.W.3d 254, 261–62 (Tex. App.—Fort
Worth 2011, pet. denied) (citations omitted).

          Significant
evidence supports the trial court’s endangerment finding.  The record
establishes that Steven had developed physical problems while in appellant’s
care because of her neglect.  According to Lepori, upon Steven’s removal in the
middle of 2010, his head was “very, very misshapen.”  Lepori testified that
Steven appeared to be severely neglected.  She said that a doctor diagnosed the
head issue to be caused by the neglect.  Although Lepori did not know whether
Steven’s head was misshapen at his birth, when she saw him sometime after his
removal, it “looked much more normal,” which indicated to her that the
misshaping was caused by neglect and was not a deformity.  Also, Steven had
“drooping” on the left side of his face and tooth decay, which the Department
attributed to neglect, apparently based on diagnoses the Department received.  Reed
testified that a child’s teeth may erode when the child is allowed to suck on a
bottle too much.  The trial court could have justifiably based its endangerment
finding on Steven’s physical issues at the time of his removal.  See In re
M.C., 917 S.W.2d 268, 270 (Tex. 1996) (holding that physical neglect may
support an endangerment finding because neglect “can be just as dangerous to
the well-being of a child as direct physical abuse”); In re T.T.F., 331
S.W.3d 461, 483–84 (Tex. App.—Fort Worth 2010, no pet.) (concluding that a
parent’s medical neglect supported a trial court’s finding under section
161.001(1)(E)).

          After
Steven’s removal, he had significant developmental delays, and he had to wear a
helmet because he would “throw tantrums and bang his head on the floor”; at the
time of trial, after being removed from appellant’s care for an extended
period, Steven was no longer throwing such tantrums.  Steven’s apparent
emotional issues that he developed while in appellant’s care also support the
trial court’s endangerment finding.  See Tex. Fam. Code Ann.
§ 161.001(1)(E).

          Appellant’s
leaving Steven with Ward also supports the trial court’s finding under section
161.001(1)(E).  When Lepori spoke to appellant after Steven’s removal, appellant
asked Lepori whether Steven had “any hand prints on him.”  According to
appellant, she did so because she assumed that he could have been removed for
physical abuse.  But Lepori testified that appellant asked about the hand
prints because appellant “said she didn’t trust Ms. Ward.  She said she’d had
previous concerns with the way Ms. Ward treated [Steven].”  In fact, Lepori testified
that appellant conveyed to her that Ward had once tied Steven to a car seat so
that he could not get out.  Appellant’s testimony indicated that Steven’s being
constrained to a car seat for periods of time within his home occurred more
than once, although it is unclear when appellant became aware of these events.

          Appellant’s
leaving Steven with Ward prompted his removal.  Ward admitted to having
psychotic issues, a substantial history of drug abuse, and several suicide
attempts.  According to Lepori, Ward indicated that appellant knew about Ward’s
psychotic issues.  When Ward informed appellant that Ward could not care for
Steven, appellant did not return to care for him or ensure that someone else could
do so; rather, by her own testimony, appellant told Ward only to get names off
of a light switch of people that could care for him.

          Next,
more than a year after Steven’s removal, appellant still could not offer him
stable housing or reliable transportation; she recognized that she was not
prepared to take him home.  The trial court could have relied on these facts to
find endangerment.  See In re T.S., No. 02-10-00089-CV, 2010 WL 4486332,
at *8 (Tex. App.—Fort Worth Nov. 10, 2010, no pet.) (mem. op.) (upholding a finding
of endangerment when the father was, among other things, unable to provide
stable housing and financially unable to care for his children); see also In
re S.D., 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied)
(explaining that conduct that subjects a child to a life of uncertainty and
instability endangers the physical and emotional well-being of the child).  Appellant’s
employment history (or lack thereof) also casts doubt concerning her ability to
adequately provide for Steven, which factors into our review of the trial
court’s endangerment finding.  See In re H.N.H., No. 02-11-00141-CV, 2012
WL 117861, at *25 (Tex. App.—Fort Worth Jan. 12, 2012, no pet.) (mem. op.)
(considering a mother’s ability to provide financially for her children as a
factor under section 161.001(1)(E)); In re M.N.G., 147 S.W.3d 521, 538–39
(Tex. App.—Fort Worth 2004, pet. denied) (op. on reh’g) (holding similarly).

          Finally,
appellant’s failure to attempt to visit Steven for several months during the
pendency of this case supports the trial court’s finding of endangerment of
Steven’s emotional well-being.  See In re U.P., 105 S.W.3d 222, 236
(Tex. App.—Houston [14th Dist.] 2003, pet. denied) (op. on reh’g).  When Reed,
who has a master’s degree in social work, was asked how a parent’s lack of
contact with a child affects the child, he testified, “It’s a huge impact.  You
know, children thrive on consistency.  And if they don’t have that, especially
something as important as their parental relationship, it can be very damaging.”

          We
recognize that some evidence weighs against the trial court’s finding under
section 161.001(1)(E).  Appellant said that while she cared for Steven, she
took him to visit doctors.  She testified that the doctors never said anything
about neglect and that Steven was current on his shots.  Although appellant
noticed that Steven’s head was misshapen, she said that a doctor expressed that
nothing was wrong with the head.  She testified that she was planning on
getting another diagnosis for the misshaping of Steven’s head but that CPS
removed him from Ward’s care before appellant could do so.  As appellant notes
in her brief, the Department did not present expert testimony concerning
Steven’s head deformity and did not call a doctor to testify that Steven’s
physical and emotional issues had resulted from neglect.

          Also,
at trial, the Department did not produce medical records verifying Ward’s
psychotic issues.  Appellant denied that she knew about the issues, and she
said that she did not have concerns about Ward’s ability to care for Steven.

          Although
some conflicts arise from the evidence and inferences at trial concerning
appellant’s degree of responsibility for Steven’s physical and emotional issues
and concerning appellant’s knowledge about Ward’s psychological problems, we
must give due consideration to evidence that the factfinder could have found to
be clear and convincing, and we must generally leave the resolution of those
conflicts to the factfinder.  See J.F.C., 96 S.W.3d at 266; T.T.F.,
331 S.W.3d at 484.  Despite the conflicting evidence, we conclude that the
trial court could have reasonably formed a firm belief or conviction that appellant
engaged in conduct or knowingly placed Steven with persons who engaged in
conduct that endangered his physical or emotional well-being.  See Tex.
Fam. Code Ann. § 161.001(1)(E); M.E.-M.N., 342 S.W.3d at 261–62. 
Thus, we hold that the evidence is factually sufficient to support the trial
court’s finding under section 161.001(1)(E), and we overrule appellant’s fourth
issue.  Because only one finding under section 161.001(1), along with a finding
of the child’s best interest, is sufficient to support termination, we decline
to address appellant’s third, fifth, and sixth issues, which challenge the
trial court’s findings under section 161.001(1)(D), (N), and (O).  See
Tex. R. App. P. 47.1; In re Z.C., 280 S.W.3d 470, 475 n.22 (Tex. App.—Fort
Worth 2009, pet. denied); In re K.A.S., 131 S.W.3d 215, 225 (Tex. App.—Fort
Worth 2004, pet. denied).

Steven’s
best interest

          In
her seventh issue, appellant argues that the evidence is factually insufficient
to prove that termination of her parental rights to Steven is in his best
interest.  See Tex. Fam. Code Ann. § 161.001(2).  There is a strong
presumption that keeping a child with a parent is in the child’s best interest. 
In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent
placement of the child in a safe environment is also presumed to be in the
child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West 2008).  Nonexclusive
factors that the factfinder may use in determining the best interest of the
child in a termination case include the desires of the child, the emotional and
physical needs of the child now and in the future, the emotional and physical
danger to the child now and in the future, the parental abilities of the
individuals seeking custody, the programs available to assist these individuals
to promote the best interest of the child, the plans for the child by these
individuals or by the agency seeking custody, the stability of the home or
proposed placement, the acts or omissions of the parent which may indicate that
the existing parent-child relationship is not a proper one, and any excuse for
the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367,
371–72 (Tex. 1976).  These factors are not exhaustive.  C.H., 89 S.W.3d
at 27.  Furthermore, undisputed evidence of just one factor may be sufficient
in a particular case to support a finding that termination is in the best
interest of the child.  Id.  On the other hand, the presence of scant
evidence relevant to each factor will not support such a finding.  Id.

          Steven
did not verbally express a desire about the termination of appellant’s parental
rights  The evidence, however, shows that he struggled physically and
emotionally at the time of his removal from appellant’s care but prospered
after his removal.  After the Department removed Steven, it took him to several
doctors and dentists and arranged for him to have a psychological evaluation. 
At the time of the trial, he was receiving speech therapy and physical therapy
in school.  He no longer had to wear a helmet because he had stopped having
tantrums.  He had also made “developmental strides.”  At the time of the trial,
Steven was three years old.  Reed testified that Steven was a “great little
boy” and was very affectionate.  Although Steven was verbally delayed, he had
made “great improvements” since his removal and his placement with Aunt.  Aunt,
who stayed home but whose husband was employed, wanted to adopt Steven.

          As
we have explained above, appellant did not comply with her service plan, and by
her actions, including her failure to visit Steven for an extended period, she seemed
to show disinterest in obtaining Steven’s return to her care.  Appellant said
that she did not visit Steven because “as a mother it is stressful, and it’s
hard on a parent to see your kid not getting that bonding with you.  And it’s
hard for a parent to be there, seeing your kid avoiding you.”  Appellant did
not know if Steven avoided her because he did not care about her or because he
just wanted to play.  Appellant admitted, however, that she could have
“[r]esponded . . . better to him.”  In contrast to appellant’s few visits
with Steven, Aunt testified that appellant visited Father regularly when he was
in a nursing home.

          As
opposed to appellant’s lack of a bond with Steven, Reed testified that Steven
had bonded with Aunt and with another child who lived in Aunt’s home.  Reed
opined that Aunt could take care of all of Steven’s needs and that Steven
should live with her on a permanent basis through adoption.  Aunt testified
that in the eight months that Steven had been in her home, he had brought joy
to her life, and she had met his educational and medical needs.  During that time,
appellant had never helped her care for Steven and had not sent him any cards
or gifts.  Appellant said that she did not call Aunt to check on Steven because
she and Aunt were “not on speaking terms.”  Appellant recognized that Aunt had
met Steven’s needs and could continue to do so in the future, and she said that
she appreciated Aunt for caring for Steven.

          Next,
although more than a year had passed since Steven’s removal, appellant was not
prepared for his return to her care even if the trial court had not terminated
her rights.  Appellant stayed with a friend in Weatherford from July 2010 until
February 2011.  After the friend kicked her out, she stayed at a shelter in
Azle until April 2011, but she failed to keep requirements of the shelter and got
kicked out there, too.  She became homeless and lived “on the streets” awhile
before living in a house with another friend.  Appellant testified that her
November 2010 application for government housing had been denied because of her
“prison status” (she had served time for possessing a controlled substance).  However,
she said that she reapplied for such housing in October 2011.

          Appellant
testified that she was trying to get a GED, and she said that during the
pendency of Steven’s case, she applied for jobs at McDonald’s, motels, and
nursing homes.  She eventually started working for an in-home healthcare
company in Stephenville.  According to appellant, she was employed from August
2011 until the trial in November 2011, at which time she was making $8.50 per
hour and working “52 hours to 80 hours a week.”  But before appellant obtained
that job, it had been about eight years since she had worked full time.  Appellant
said that she was trying to obtain a car, although her driver’s license had
been suspended since 2001 and although she needed to pay $1,500 for it to be
reinstated.  She did not have health insurance at the time of the trial, and
she received food stamps.

          Appellant
conceded to having a long history with CPS, but she said that the reports of neglect
of her children have been “based on lies.”  Nonetheless, the termination of her
rights to nine other children casts doubt on her ability to effectively parent
Steven.  Appellant agreed that at the time of the trial, she was not able to
take Steven home with her, but she asked the court to name her a possessory
conservator so she could continue to have access to him.  She said that it was
not in Steven’s best interest for the trial court to terminate her parental
rights because doing so would “mess him up totally” and “brainwash him” to
treat her unkindly later in his life.  She explained, “It’s not fair for a
child to grow up without at least one of the parents involved in [his] life.”

          Lepori
opined that appellant had left Steven with an inappropriate caregiver when she allowed
Ward to possess him.  When Reed was asked whether appellant was able to meet
Steven’s needs, he responded, “Absolutely not.”  Reed testified that he would
be concerned if Steven went home with appellant.  He also opined that appellant
had not demonstrated an ability to provide Steven with a safe environment.  Aunt
said that in the time she has known appellant, she had not seen appellant
demonstrate an ability to parent a child, and Aunt believed that appellant’s
presence in Steven’s life was disruptive.  Jesus Nevarez, appellant’s guardian
ad litem (who is also an attorney), expressed his belief that appellant could
not appropriately parent Steven and that Steven would not be safe with
appellant if appellant did not have a home.  Nevarez believed that appellant
understood the consequences of not cooperating with CPS and completing her
service plan.

          Applying
all of these facts and the other facts recited above to the Holley
factors, we hold that the trial court could have reasonably formed a firm
belief or conviction that termination of appellant’s parental rights is in
Steven’s best interest.  See Tex. Fam. Code Ann. § 161.001(2); Holley,
544 S.W.2d at 371–72; see also R.R., 294 S.W.3d at 237 (explaining that
a father’s difficulty maintaining safe and stable housing, his inconsistent
employment history with no guaranteed income, and his inappropriate choices
that put his children in danger all demonstrated that it was in the children’s
best interest that the father’s parental rights be terminated).  We overrule
appellant’s seventh issue.

The
Trial Court’s Admission of Two Exhibits

          In
her first two issues, appellant argues that the trial court erred by admitting
two exhibits into evidence.  Near the beginning of the trial, the Department
introduced certified copies of affidavits of voluntary relinquishment that Father
and appellant had executed with respect to one of appellant’s children,
J.D.L.C., in March 2005.  Appellant objected to the admission of the documents
on the ground of relevance, but the trial court admitted them.

          For
error to be reversible in a civil case, the error must have probably caused the
rendition of an improper judgment or probably prevented the appellant from
properly presenting a case to a court of appeals.  Tex. R. App. P. 44.1(a).  Error
in the admission of evidence is generally harmless when the objecting party
allows other evidence of the same or similar facts to be admitted without an
objection.  Volkswagen of Am., Inc. v. Ramirez, 159 S.W.3d 897, 907 (Tex.
2004); In re M.H., 319 S.W.3d 137, 148 (Tex. App.—Waco 2010, no pet.); In
re S.B., 207 S.W.3d 877, 883 (Tex. App.—Fort Worth 2006, no pet.).

          Along
with the affidavits of relinquishment, the Department introduced an order terminating
appellant’s and Father’s rights to J.D.L.C.  Appellant did not object to the
admission of the order, which recited that appellant and Father had
relinquished their rights, stated that they had endangered and had
constructively abandoned J.D.L.C., and explained that termination of their
rights to J.D.L.C. was in his best interest.  Also, appellant did not object to
the admission of Nebraska orders of termination for six more of her children.

          Because
appellant failed to object to evidence that contained the same information that
the objected-to evidence conveyed (appellant’s and Father’s voluntary
relinquishment of their parental rights to J.D.L.C.), we hold that any
potential error of the trial court in admitting the affidavits of voluntary
relinquishment is harmless.  See Tex. R. App. P. 44.1; S.B., 207
S.W.3d at 883.  We overrule appellant’s first two issues.

Conclusion

          Having
overruled all of appellant’s dispositive issues, we affirm the trial court’s
judgment.

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL:  LIVINGSTON, C.J.; WALKER and GABRIEL, JJ.

 

DELIVERED:  March 15, 2012









[1]See Tex. R. App. P. 47.4.





[2]Throughout this opinion,
we will use “Steven” as an alias to refer to S.I.H.  See Tex. R. App. P.
9.8(b)(2).





[3]During the course of
Steven’s case, appellant became pregnant and had a child in Nebraska.  The
termination of appellant’s rights to her eleventh child was pending at the time
of the trial concerning Steven.





[4]Steven’s father (Father),
with whom mother apparently had a common law marriage, died in October 2011.





[5]Appellant testified that
she left Steven with Ward for “about two weeks.”  She said that Ward eventually
expressed that she could not keep Steven, and although appellant gave Ward a
list of names of people who might be able to care for him, Ward “turned around
and lied . . . and she called CPS.”





[6]See Tex. Fam. Code
Ann. § 262.201 (West Supp. 2011).





[7]See Tex. Fam. Code
Ann. § 263.106 (West Supp. 2011).





[8]Appellant disagreed with
Reed’s testimony that she only contacted him once every several months. 
Instead, appellant testified that she tried to contact him “every single day”
and left messages for him.





[9]The record reflects that
appellant lived approximately seven blocks from where the counseling sessions
were scheduled.  Appellant arranged to get from Texas to Nebraska by a bus to
birth another child although she denied having $2 or $3 for a round trip on
public transportation to attend counseling.